IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-00026-04-CR-W-FJG |
| ) | |
| CHRISTOPHER L. ELDER, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on the following two motions:

1. Defendant Elder's Motion in Limine to Preclude Testimony of a Houston Police Department Officer Who is Purportedly an Expert on the Question of How Prescription Medication is Obtained Illegally and Dispensed as an Illegal Controlled Substance in the Houston Area on Grounds of Relevancy and Unfair Rule 403, FREV, Prejudice (doc #169); and

2. Defendant Elder's Request for a Daubert Hearing on the Issue of the Qualifications of Houston Police Officer John Kowal to Testify and Offer Opinion Testimony as an Expert on Issues Dealing With "Methods of Pharmaceutical Diversion, Including Inappropriate Prescribing, Prescription Rings, Doctor Shopping and 'Crew Boss' Conspiracies" (doc #235).

For the reasons set forth below, it is recommended that the district court reserve ruling on the admissibility of Officer Kowal's expert testimony until immediately prior to the close of the government's case.

I. INTRODUCTION

On February 6, 2008, the Grand Jury returned a twenty-four count indictment against Mary Lynn Rostie, Cynthia S. Martin, Troy R. Solomon, Christopher L. Elder and Delmon L. Johnson. Defendant Elder is charged in Counts One and Three through Ten of the indictment. Count One of the indictment charges a conspiracy to distribute controlled substances. Counts Three through Ten charge the distribution of controlled substances.

On June 4, 2010, an evidentiary hearing was held on defendant Elder's motions regarding Officer John Kowal of the Houston Police Department. Defendant Elder was represented by

retained counsel John Osgood. The Government was represented by Assistant United States Attorneys J. Curt Bohling and Rudolph R. Rhodes. The Government called Officer John Kowal of the Houston, Texas Police Department as a witness. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. John Kowal is currently an investigator in the Drug Diversion Unit of the Houston Police Department Narcotics Division. (Tr. at 6) Officer Kowal graduated from the University of Illinois (Chicago) in 1982 with a degree in criminal justice. (Tr. at 7; Government's Ex. 1) Officer Kowal entered the Houston Police Academy in September 1982 and has remained with the Houston Police Department to the present. (Tr. at 7) In December 1986, Officer Kowal was selected into the Houston Police Department Narcotics Division. (Tr. at 8)

2. Eventually, Officer Kowal was assigned to the Pharmaceutical Investigation Unit within the Narcotics Division. (Tr. at 8) In the Pharmaceutical Investigation Unit, Officer Kowal investigated the diversion of pharmaceuticals for illicit purposes. (Tr. at 8) This encompasses anything and everybody who may have a medical license, a pharmacy license or a DEA or Texas Department of Public Safety Registration number. (Tr. at 8-9) It may also include theft of prescription drugs, fraudulent prescription cases and anything to do with pharmaceutical drugs. (Tr. at 9)

3. In October 1999, Officer Kowal was selected into a Tactical Diversion Squad of the Drug Enforcement Administration based in the Houston office. (Tr. at 9) Officer Kowal continued to conduct the same type of investigations he had previously conducted, but of an upper level variety. (Tr. at 9)

4. In January 2007, Officer Kowal's assignment changed again. (Tr. at 9) The Houston Police Department along with the political powers noticed that there was an up-tick or a trend in drug diversion that was filtering down to the middle school level. (Tr. at 9) A unit was formed consisting of five officers, one supervisory sergeant and a Drug Enforcement agent and based out of the Houston Police Department to address local pharmaceutical issues. (Tr. at 9) Officer Kowal was assigned to this unit and has continued in this assignment to the present. (Tr. at 10)

5. During his time with the Houston Police Department, Officer Kowal has made hundreds of arrests in diversion cases. (Tr. at 10) Officer Kowal has been involved in hundreds of search warrants in diversion cases. (Tr. at 10) Officer Kowal has been involved in the seizures of diverted pharmaceutical drugs almost daily. (Tr. at 10) Officer Kowal has never checked to see if anybody has ever been arrested with a bottle of pills issued by Dr. Elder or from Ascensia Pharmacy. (Tr. at 37)

6. Officer Kowal has received specialized training in the area of drug diversion as part of his duties with the Houston Police Department. (Tr. at 10) Whenever a request comes in to make a presentation on diversion issues at a local school, peer group, pharmacy group or medical group, Officer Kowal is sent to make the presentation.

2

(Tr. at 11) For the last fifteen years, Officer Kowal has done a two-hour block of instruction at the University of Houston School of Pharmacy on the latest diversion trends in the Houston/Harris County area. (Tr. at 11) Officer Kowal's name and contact phone numbers are provided by the Harris County Medical Society to doctors in the Houston area who have questions in regard to pharmaceutical diversion issues. (Tr. at 11-12)

7. On a daily basis, Officer Kowal deals with people who are involved in drug diversion, from loss prevention officers of major pharmaceutical companies or drug store chains to doctors and their office managers to heads of hospitals and their security officers. (Tr. at 12) At the Houston Police Department, the officers investigate anything and everything that a citizen may call in and complain about in regards to pharmaceutical drugs to proactive investigations where the officers employ regular narcotic investigative techniques. (Tr. at 12-13)

8. Officer Kowal defines the term "drug diversion" as follows:

> The way I define diversion is you take an illicit drug, which is a pharmaceutical controlled substance or dangerous drug that we're all basically aware of that comes from a pharmacy. And then what happens is, when a person takes that, not for their legitimate medical purpose or a purpose other than what it was intended for, whether they're – and how they got that drug, whether it was diverted or taken away from the regular supply chain through illicit means, it may be fraudulent prescriptions, it may be theft, it may be doctors that have issued prescription for non-legitimate medical purposes. ... Once the drugs are removed from their legitimate medical needs, by, like I say, theft, fraudulent prescriptions, doctors' indiscriminate prescribing habits, they enter the illicit drug chain. It's like you would think of cocaine, marijuana or heroin. Even though they're inherently legal drugs to possess, once you get them for their unintended purposes, then they are bought and sold just like any other illicit commodity.

(Tr. at 13-14)

9. Officer Kowal testified that Houston is known as a source city for diverted prescription drugs. (Tr. at 14) Officer Kowal testified that this has occurred because Houston has one of the world's largest medical centers, St. Luke's Medical Center, the Heart Institute, and the MD [Anderson] cancer center, which attracts a lot of doctors, nurses and physician's assistants from all over the world who come for employment. (Tr. at 14-15) With that, are spinoffs of pharmacies, drug manufacturers and wholesalers that have to supply the chain. (Tr. at 15) There are many medical professionals living in the Houston/Harris County area. (Tr. at 15) In addition, Houston has a large homeless and indigent population. (Tr. at 15)

10. Officer Kowal testified that recruiters seek out homeless people and take them to pain management/wellness clinic centers where they are given a little or no medical exam for a cash fee of $75 to $100 and then issued a prescription for controlled substances. (Tr. at 15, 17) The recruiter provides the cash for the office visit. (Tr. at 17) The clinics see a large number of patients in a day, with a visit lasting anywhere from thirty seconds to five minutes. (Tr. at 51) The prescriptions are written for the same drugs, for the same quantities, for the same milligram strength over and over again. (Tr. at 51) Once the homeless, unemployed, or mentally

3

challenged person is recruited and taken to a clinic, they are then directed to a specific pharmacy to get the prescription filled. (Tr. at 16) The controlled substance is then given to the recruiter and the homeless person is usually given a fast food meal and paid $20 or $25 for their time. (Tr. at 16) The recruiter then gives the prescription bags he has collected to the person that paid him and the drugs are considered diverted to the illicit drug market. (Tr. at 17) The person who paid the recruiter, the drug dealer, then sells the prescription drugs either in small quantities on the street or in large quantities out of state. (Tr. at 21) As with any other illicit transaction, sales are done by cash. (Tr. at 24)

11. The most popular drug that is currently being diverted in Houston is hydrocodone, sold under the trade names of Vicodin, Vicodin extra strength, Lortab and Lorcet. (Tr. at 19) Today, a typical hydrocodone pill will sell for between $3 and $4 on the street, if someone is buying four to fifteen pills at a time for their own consumption. (Tr. at 21-22) During the time frame of 2004 to 2005, hydrocodone sold for about $2 to $3 a tablet. (Tr. at 22) The second most popular diverted drug would be alprazolam or Xanax. (Tr. at 19) The third most popular is carisoprodol, which is also known as Soma. (Tr. at 19) The fourth is promethazine or Phenergan with codeine cough syrup. (Tr. at 19) When people go to the pain clinics, they are always issued a combination of these three to four drugs. (Tr. at 19) This combination of drugs is known in Houston as the prescription cocktail and has taken the place of illicit drugs like cocaine, heroin or marijuana. (Tr. at 19) The prescription cocktail is the drug seen in approximately 80 percent of deaths due to drug overdoses in Houston. (Tr. at 46)

12. More hydrocodone, Xanax and Soma are ordered in the Houston area per person than in other parts of the country. (Tr. at 48) People from surrounding states such as Louisiana, Alabama and Arkansas visit Houston because there is no doctor shopping law in Texas, i.e. a single person can go to multiple clinics in the same day and receive prescriptions for the same medications in Texas, but not in other states where such a practice is illegal. (Tr. at 49-50) In Texas, physician's assistants as well as nurse practitioners can also write prescriptions for the drugs used in the prescription cocktail. (Tr. at 50)

13. Officer Kowal testified that he has also seen other methods used to divert pharmaceutical drugs to the streets – pharmacies, drug manufacturers or wholesalers can be burglarized and drugs stolen, there might be employee theft or pilferage, there could also be fraudulent prescriptions where the patient alters the prescription or complicated fraudulent prescription rings where a group of individuals compromise a doctor's DEA and DPS number, manufacture prescriptions and then recruit people to go pass those prescriptions. (Tr. at 19-20) However, the biggest problem right now in the Houston area would be the indiscriminate prescribing of prescription drugs by doctors. (Tr. at 20)

14. There appears to be an appeal on the streets to prescription drugs over more traditional illegal drugs like cocaine because they are seen as not illegal and are manufactured and provided here in this country. (Tr. at 22-23) Prescription drugs can be obtained through a legitimate means by prescriptions, so they do not have the same stigma as cocaine, methamphetamine or heroin. (Tr. at 23) One of the biggest lures of prescription drugs is that the buyer knows what he is buying because the drugs are particularly stamped. (Tr. at 23) The buyer knows that the strength is going to be consistent because the manufacturers make it so. (Tr. at 23) The buyer

does not have to worry about whether he got ripped off as with cocaine or heroin that has been cut or diluted. (Tr. at 23-24)

15. Officer Kowal has no medical training other than first responder-type training. (Tr. at 40)

16. Officer Kowal responded to a call where a doctor was reporting a fraudulent prescription problem. (Tr. at 41-42) The doctor reporting the problem was Dr. Elder. (Tr. at 41-42) This call took place after Dr. Elder was indicted. (Tr. at 42) Officer Kowal did not recognize Dr. Elder's name when he went to meet with him. (Tr. at 42) When Officer Kowal realized that Dr. Elder had a case pending, Officer Kowal told Dr. Elder that he did not want to talk about the facts of Dr. Elder's case, just the facts of the fraudulent prescription case that Dr. Elder had called in about. (Tr. at 44-45)

### III. DISCUSSION

Federal Rule of Evidence 702 permits a district court to allow the testimony of a witness whose knowledge, skill, experience, training, or education will assist the trier of fact in understanding an area involving specialized subject matter. See United States v. Jeanetta, 533 F.3d 651, 657 (8th Cir.), cert. denied, 129 S.Ct. 747 (2008). Such a witness is regarded as an expert under Rule 702. Id. "'A district court has discretion to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar.'" Id. (quoting United States v. Brown, 110 F.3d 605, 610 (8th Cir. 1997)). In deciding whether to permit expert testimony, the district court must balance the probative value of the testimony with its possible prejudicial effects. Jeanetta, 533 F.3d at 657 (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 595 (1993)).

At the hearing, the Government provided the following to the Court in a document entitled "Officer John Kowal – proposed testimony":

> The United States will be offering the testimony of John Kowal a Police Officer with Houston Police Department, as an expert witness in the provision and trafficking of certain drugs, usually available by prescription, as illegally-used drugs of abuse in the Houston, Texas, area. Officer Kowal's testimony is based upon his extensive experience with drug diversion investigations. ...
>
> Officer Kowal has extensive training and experience as a police officer with the Houston Police Department. During his employment as a Police Officer, he was a member of a Drug Enforcement Administration Task Force in Houston, Texas as a Task Force Officer in the Tactical Diversion Squad for approximately eight years. He is currently a member of a squad of six officers and one sergeant that are

5

dedicated to investigate diversion investigations. Since December 1986, Officer Kowal has specialized in drug diversion investigations. During his experience, he has participated in numerous narcotic investigations. He has debriefed numerous defendants, informants, and witnesses who had person knowledge regarding major narcotic trafficking organizations.

Additionally, he has participated in many aspects of drug investigations including undercover operations, conducting surveillance, and arrests. He is familiar with prescription narcotics traffickers' methods of operation including the distribution, storage, and transportation of prescription narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. Officer Kowal will explain that Houston, Texas, has a rampant problem with the abuse of prescription drugs, and in particular hydrocodone (sold under the trade names, such as Lorcet and Lortab), Soma (a sleeping aid), and codeine-containing cough syrup, known together as a "Houston Cocktail."

Houston is a source city for these substances, and abusers travel to Houston from Louisiana and other places to acquire these drugs. Medical clinics throughout the city provide these drugs to "patients" after cursory examinations and without regard to the "patient's" medical need for the drugs. Patients pay in cash for their clinic visits, and they typically visit multiple clinics to acquire drugs. On occasion, third parties gather groups of people to visit clinics and acquire drugs, with the third party paying for the office visit and the prescription in exchange for of [sic] the drugs acquired. Prescription hydrocodone, soma, and cough syrup are routinely diverted and sold on the street at a considerable mark-up from the prescription retail price. Officer Kowal will articulate the estimated street value of the prescription drugs.

Officer Kowal's testimony pertains not to medical diagnosis, but to drug dealing. At certain times and places, certain drugs become the predominate drugs of abuse in an area. In the 1990s for many cities, it was crack cocaine. In the 2000s in Kansas City it has been methamphetamine. In Houston, Texas, currently, hydrocodone, Soma, and codeine-containing cough syrup are the predominant drugs of abuse. That these drugs are prescription drugs in addition to drugs of widespread abuse does not change that fact. Officer Kowal's testimony is grounded on his training and experience as an investigator of diverted prescription drugs. The information he will impart comes from his investigations, his training, and his interviews with people involved in acquiring and selling diverted drugs. Officer Kowal will not be asked to opine on individual doctor-patient interactions, as his testimony is broader in scope.

Officer Kowal's testimony is necessary to allow the jury to understand the business and techniques of the trafficking of prescription drugs in Houston, subjects that jury members would have little or no knowledge of otherwise. ...

* * *

... The government will not ask Officer Kowal to opine about the state of mind of any defendant, or even to opine about the facts of this case in specific, but will instead ask more general questions about the business and *modus operandi* of acquisition and trafficking of prescription drugs in Houston for the purposes of abuse. ...

(Officer John Kowal – proposed testimony) The above proposed testimony is consistent with the

6

direct testimony Officer Kowal provided at the Daubert hearing. It appears that Officer Kowal is qualified to speak to these matters. Even defendant Elder's counsel commented that Officer Kowal "sounds like he's pretty well qualified to testify what he just testified to." (Tr. at 24)

The issue becomes whether this testimony is relevant to the issues before the jury, that is whether it has probative value. As defendant Elder's counsel stated during the hearing, "I don't see the connection between his testimony ... and this case. ... These prescriptions were filled here and sent by fax back to Ascensia. The trail ends there. I'm gleaning from his testimony they're trying to make a giant leap here to say all of this must have occurred in this case because they don't have any further trail. ... Now, that becomes very prejudicial." (Tr. at 24) In his motion in limine, defendant Elder argues that there are no allegations in the indictment and no discovery presented as to what happened to the prescriptions once they were sent to Houston from Missouri. (Motion in Limine, (doc #169) at 3) According to defendant Elder, "[i]t would appear that the government simply wants to fill in this gap in the story by calling a police officer who will provide highly subjective and speculative testimony as to what happened to these medications after they arrived in Houston without even the slightest bit of hard evidence, direct or circumstantial, to back up his suppositions." (Id.)

When questioned by the Court as to whether evidence regarding recruiters will be presented in this case, government counsel stated that recruiters were not directly involved so "it may be appropriate to cut down that part of the presentation or to eliminate it because it may not be directly relevant to the case." (Tr. at 26) Government counsel went on to state, "our initial thought right now is we'll cut the presentation down so that Officer Kowal does not talk directly about the recruiters. And only if it became relevant in the evidence, and it probably won't, I don't think it will, would we seek to have that kind of testimony admitted." (Tr. at 26)

In addition to setting forth the proposed testimony of Officer Kowal, the document entitled "Officer John Kowal – proposed testimony" also provided the following information relating to the

7

case the government intends to present at trial:[1]

> Contrary to Elder's assertion, very strong circumstantial evidence at trial will establish the drugs acquired from The Medicine Shoppe pharmacy in Belton, Missouri, using prescriptions written by Elder and others, and mailed to Elder at his place of employment in Texas, were diverted. The evidence will show that none of these prescriptions were authorized by the patients to be filled in Missouri and they were unaware that they were being filled in Missouri. These prescriptions were entirely fraudulent; patient information was used (and sometimes changed in small ways) to obtain these drugs without the patient's knowledge.
>
> Some of the prescriptions, including prescriptions written by Elder, were duplicate prescriptions, where the original prescriptions were actually filled by the patient at a pharmacy in Houston. The drugs sent by mail from Belton to Houston were taken out of the building shared by South Texas Wellness Center, where Elder worked and where the drugs were addressed, although they had no legitimate destination. Additionally, co-defendant and co-conspirator Troy Solomon expended tens of thousands of dollars in cash, even though he had no known legitimate source for that cash. In short, the government's case for diversion is very strong, and Officer Kowal's testimony is highly relevant within the context of that case.

(Document entitled "Officer John Kowal – proposed testimony" at 2-3) At the hearing, government counsel reiterated that it will have this evidence at trial. (Tr. at 28)

When questioned by the Court as to whether Officer Kowal presented any testimony about the type of fraudulent scheme at issue in this case, i.e. sending prescriptions out of state to have them filled, government counsel responded that this case is "a variation on a theme of a fraudulent prescription scheme, and it's not one – it's probably, it may be unique, honestly. I don't know that – and I think I've asked Officer Kowal, and I don't know that he's seen one quite like this before." (Tr. at 30) However, government counsel believes that the scheme charged in this indictment falls into a category Officer Kowal's discussed, that is a false prescription scheme. (Tr. at 30) According to the government, "the important point here that's crucial to the jury's understanding of the evidence is essentially that there is a huge market for diverted pharmaceutical drugs in Houston. And then, of course, how much those drugs sell for on the street, how they're distributed. That's

---

[1] The Court assumes this information will not be presented through Officer Kowal as the document states that "Officer Kowal will not be asked to opine on individual doctor-patient interactions, as his testimony is broader in scope" nor will he be asked to "opine about the facts of this case in specific, but will instead ask more general questions about the business and modus operandi of acquisition and trafficking of prescription drugs in Houston for the purposes of abuse." (Document entitled "Officer John Kowal – proposed testimony" at 2 and 3)

the piece that the jury will not understand without Officer Kowal's testimony." (Tr. at 30)

IV. CONCLUSION

As set forth by the Honorable Fernando J. Gaitan, Jr., in United States v. Wright, a case in which the government sought to admit the testimony of a police detective as an expert on street gangs:

> it is generally viewed as "improper ... for a party to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury." 6 Weinstein's Federal Evidence § 1006.04[3] .... [T]his practice is particularly problematic practice in criminal cases because it allows "the government to paint a picture of guilt before the [supporting] evidence has been introduced." United States v. Griffin, 324 F.3d 330, 349 (5th Cir. 2003); see United States v. Casas, 356 F.3d 104, 119 (1st Cir. 2004)(observing that agent's overview testimony essentially stated "that each of the defendants was guilty of the conspiracy charged").

Wright, 2006 WL 2043090, *1 (W.D. Mo. July 20, 2006)(quoting United States v. Garcia, 413 F.3d 201, 214 (2nd Cir. 2005).

Given the difference in the type of alleged fraudulent scheme at issue in this case with the typical scheme to which Officer Kowal testified and defendant Elder's argument that there will be no evidence, direct or circumstantial, to suggest what happened to the prescriptions sent to Houston from Missouri, the undersigned recommends that the district court reserve ruling on the admissibility of Officer Kowal's expert testimony until immediately prior to the close of the government's case. At that time, the Court can determine whether there are sufficient facts in evidence to allow Officer Kowal to apply his experience and knowledge to the facts of this case to provide expert testimony that would assist the trier of fact.

                                                */s/ Sarah W. Hays*
                                                SARAH W. HAYS
                                   UNITED STATES MAGISTRATE JUDGE